J-A35036-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMES MOORE, | |
| Appellant | No. 338 WDA 2014 |

Appeal from the Judgment of Sentence October 4, 2013
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0001608-2012

BEFORE: BENDER, P.J.E., BOWES, and ALLEN, JJ.

MEMORANDUM BY BOWES, J.:                     **FILED JANUARY 09, 2015**

James Moore appeals from his aggregate judgment of sentence of twenty to forty years incarceration after a jury found him guilty of numerous delivery and possession with intent to deliver ("PWID") counts, two counts of corrupt organizations, criminal conspiracy, and hindering apprehension. We affirm the findings of guilt, but vacate his judgment of sentence and remand for resentencing.

The facts of this case involve a drug trafficking enterprise in which Appellant was a principal member. Much of the testimony against Appellant was relayed by eight admitted heroin addicts. One such person, Jessica Bales, testified to meeting with Appellant in the summer of 2011 to sell heroin for him. Ms. Bales acknowledged that she did not personally observe Appellant sell heroin, but maintained that he kept a shoe box

containing heroin in the ceiling tiles of her apartment. During this time, Appellant also introduced Ms. Bales to Dominick Haynes, also known as Dot or Dottie. Mr. Haynes was tried together with Appellant. According to Ms. Bales, Mr. Haynes stayed at her apartment and she personally witnessed him sell heroin. She also received heroin in exchange for allowing Appellant and Mr. Haynes to sell heroin from her residence. Ms. Bales moved later that fall from that apartment to a trailer in Mennock Manor, Greensburg. There, Mr. Haynes and Chance "Sky" McKiver sold heroin. Mr. McKiver had previously sold heroin from Ms. Bales' prior apartment as well. Mr. Haynes and Mr. McKiver supplied Ms. Bales with heroin in exchange for using her home.

During the fall of 2011, Kelsey Graham, a twenty-two-year-old women and heroin addict, purchased heroin from Appellant. Ms. Graham averred that Appellant began to provide her with four stamp bags of heroin in exchange for sex. Further, Ms. Graham traveled with Appellant to New Jersey on November 1, 2011, so that he could purchase heroin for resale in Pennsylvania. A New Jersey State Trooper, Daniel Wojcik, was able to confirm this trip because he had conducted a traffic stop of the two. When Appellant and Ms. Graham returned to the Greensburg area, Appellant gave her ten stamp bags of heroin.

Around this same time, Jillian Davis, another heroin addict, returned to her Hawksworth Garden apartment after a stay in rehab. She then met

Mr. McKiver and another individual, Tyrone Leonard, in order to purchase heroin. Ms. Davis allowed the two men to sell heroin from her apartment for several days. Thereafter, Ms. Davis met Appellant, who inquired if other dealers could stay at her apartment. She agreed and Mr. Haynes and Chauncy "Gunner" Bray began to sell heroin in December 2011 and January 2012. In January 2012, Ms. Davis returned to rehab and gave Mr. Bray a key to her apartment. Mr. Bray agreed to pay her rent for January.

Additional testimony revealed that on December 7, 2011, Appellant met with Anna Morcheid and Mr. Bray at a Red Robin restaurant. Mr. Bray had recently been released from prison. Before he was incarcerated, Mr. Bray provided Appellant with a cell phone containing heroin contacts. In addition, he had given to Ms. Morcheid a cell phone with contacts of individuals who purchased cocaine. Mr. Bray and Appellant apparently had some dispute over a woman. The Red Robin meeting was designed to settle the issue. While the three individuals were meeting at Red Robin, a confidential informant ("CI") working with Detective Jerry Vernail of the Greensburg Police and State Trooper Greg Norton arranged to purchase cocaine. Ms. Morcheid left the restaurant and provided crack cocaine to the CI.

As a result of the Red Robin meeting, Mr. Bray began to sell heroin that was supplied by Appellant. According to Mr. Bray, Appellant would provide him with ten bricks of heroin for $2500, and Mr. Bray would sell that

product for $5000. Mr. Bray indicated that he used other dealers to sell the heroin, including his girlfriend Nicole Dudek. Mr. Bray estimated that for three or four weeks he sold between ten and thirty bricks of heroin, provided to him by Appellant, every few days.

In January 2012, Detective Vernail and Trooper Norton began to utilize Jimmie Knight as a CI. Mr. Knight would contact a certain 724-217-xxxx number to arrange for heroin purchases. On January 19, 2012, Mr. Knight called that number and met Appellant at the Hawksworth Garden apartments. Trooper Norton was with Mr. Knight at the time in Mr. Knight's car. However, Mr. Knight and Appellant walked behind the apartment building out of Trooper Norton's sight. Mr. Knight returned with twenty-four bags of heroin and without the $190 provided by police for the purchase.

A similar incident occurred on January 23, 2012. Mr. Knight telephoned the aforementioned number and was instructed to return to the same location. Both he and Trooper Norton traveled to the Hawksworth Garden apartments. Mr. Knight again went out of the sight of the trooper for approximately ten to fifteen seconds, when he entered a stairwell. Mr. Knight then turned over twenty stamp bags of heroin. Although Trooper Norton did not see Appellant on this date, Mr. Knight maintained that he twice purchased heroin from Appellant in the Hawksworth Garden apartment stairwell.

The following day Trooper Norton and Mr. Knight arranged for an additional heroin purchase. On this occasion, Mr. Knight called another number, 412-853-xxxx, and spoke to an individual identified only as "Sosa." Trooper Norton was able to purchase fourteen stamp bags of heroin from Sosa in exchange for $120. The day after this purchase, Trooper Norton and Mr. Knight were instructed to go to Ms. Bales' residence at Mennock Manor to make their desired heroin purchase. Sosa exited Ms. Bales' trailer and sold Mr. Knight fifty stamp bags of heroin for $350.

Trooper Norton and Mr. Knight made an additional purchase on February 7, 2012 at the Days Inn in New Stanton, Pennsylvania. There, Mr. McKiver sold Mr. Knight twenty-five stamp bags of heroin in exchange for $200. On February 9, 2012, Trooper Norton purchased heroin from Sosa at a Knights Inn in Greensburg after telephoning the 724-217-xxxx number. Trooper Norton bought fifty stamp bags of heroin for $400.

As part of the February 9, 2012 transaction, Detective Vernail effectuated a traffic stop of a car after its occupants had been observed buying drugs at the Knights Inn. At police direction, one occupant called the 724-217-xxxx number to arrange for another purchase. Ms. Dudek sold the individual eleven stamp bags.

Trooper Norton and Mr. Knight again purchased heroin from Mr. McKiver on February 21, 2012, buying twenty-three stamp bags of heroin. That same date Appellant contacted Mr. Bray to inquire if he wanted

Appellant's "dope" phone with the 724-217-xxxx number and nine bricks of heroin. Mr. Bray, Ms. Dudek and Kristin Weightman met with Appellant to discuss drug business. Appellant gave Ms. Weightman the nine bricks of heroin, suboxone, and a cell phone. Mr. Bray stashed six of the bricks of heroin and much of the suboxone at Ms. Dudek's home. Ms. Dudek, Ms. Weightman, and Mr. Bray then traveled to Ms. Davis' Hawskworth Garden apartment. Mr. Haynes arrived later that evening and he and Ms. Weightman stayed the night. Ms. Weightman was selling heroin from the apartment that night.

The next day, February 22, 2012, police observed Ms. Weightman conduct several hand-to-hand drug transactions outside the Hawksworth Garden apartments. Police pulled over one customer, who admitted to purchasing heroin from Ms. Weightman. Police witnessed Ms. Weightman return to apartment B23, Ms. Davis' apartment, after the drug deals. After observing a sale, police began to approach Ms. Weightman and another individual, Kurt McCamley. Mr. McCamley had been instructed by Mr. Bray to retrieve nine bricks of heroin from Mr. McCamley's home and bring it to the apartment.

Police did not intercept Ms. Weightman before she entered the apartment. Upon approaching the door, police detected a powerful marijuana smell emanating from the apartment. After knocking and asking to speak to the renter, police heard some movement inside. They then

repeatedly identified themselves as police. No one answered and the troopers forcibly entered. Upon entering, Mr. Bray, who was inside, attempted to flee and was captured. Police saw, in plain view, the nine bricks of heroin and a large amount of money. Also present in the apartment were Mr. Haynes, Mr. McKiver, and Daniel Bizzelle.[1] A cellphone with the 724-217-xxxx number was among the phones located in the apartment. Appellant was not present.

As part of the investigation, police that same day executed a search warrant for Ms. Dudek's home. That search uncovered six bricks of heroin, suboxone, cash, and cell phones. Police contacted Ms. Dudek, told her of their discovery, and attempted to arrange for her to turn herself in. Ms. Dudek lied to police regarding her location and contacted Appellant. Appellant then arranged for another woman to pick up Ms. Dudek. Ms. Dudek stayed with Appellant for five days and Mr. Haynes one night. Both men knew she was wanted by police. After Mr. Haynes expressed concern about her being at his residence, Ms. Dudek turned herself in to police. She provided information to Detective Vernail that Ms. Morcheid was in possession of additional bricks of heroin. Police arrested Ms. Morcheid on March 2, 2012, in possession of eight bricks of heroin.

_____

[1] Mr. Bizzelle is the younger brother of Chauncy Bray. He was also referred to at one point as Dante Bizzelle.

On March 13, 2012, Appellant asked one of his buyers, heroin addict Laura Beth Stinson, to pick up and house two individuals: Earl Alford and Khalil Thomas. The two possessed heroin and cash. Ms. Stinson transported the individuals to her home in exchange for heroin. Trooper Norton and Mr. Knight made a purchase of thirty-six stamp bags of heroin from that location that day. Another trooper stopped Ms. Stinson after she left her residence. Ms. Stinson agreed to allow police to search her home. Police found Mr. Alford and Mr. Thomas inside. Mr. Alford was seated on a toilet in the bathroom, the tank of which concealed heroin. Mr. Thomas was in a bedroom where heroin was found behind a dresser. In April, police were able to locate Appellant. At the time of his arrest, he had in his possession another cellphone with the identical 724-217-xxxx number.[2]

The Commonwealth charged Appellant with twenty criminal counts. The charges included two counts of corrupt organizations, criminal conspiracy, twelve counts of delivery of a controlled substance, four counts of possession with intent to deliver a controlled substance,[3] and hindering apprehension. The jury convicted Appellant of sixteen counts, finding him not guilty of two delivery counts and two PWID charges. The trial court

---

[2] A Commonwealth forensics expert testified that an individual can have two phones with the same number by asking for the telephone subscriber to reissue a SIM card with that number.

[3] We are aware that both delivery and possession with intent to deliver are governed by the same statute.

imposed sentence on October 4, 2013. The court sentenced Appellant to consecutive two and one-half-to-five-year terms of incarceration on the corrupt organizations crimes. In addition, it imposed five consecutive two-to-four-year periods of incarceration for delivery and PWID crimes. Lastly, the court sentenced Appellant, pursuant to a mandatory minimum based on the weight of the drugs, to five to ten years incarceration. The court imposed the remaining sentences concurrently. As mentioned, Appellant's aggregate sentence was twenty to forty years imprisonment.

Appellant filed a timely post-sentence motion, which included a challenge to the alleged excessiveness of his sentence. The trial court denied Appellant's motion. This timely appeal ensued. The trial court directed Appellant to file and serve a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant complied, and the trial court authored its Pa.R.A.P. 1925(a) decision. The matter is now ready for this Court's review. Appellant raises six issues on appeal.

1.  Whether the court below erred [in] failing to grant a motion for judgment of acquittal, where there was insufficient evidence to sustain a guilty verdict with respect to the following charges:

    a. Count 4—Delivery of a Controlled Substance—January 2011 to April 19, 2012
    b. Count 6—Delivery of a Controlled Substance—Crack Cocaine—Red Robin—December 7, 2011; and
    c. Count 8—Delivery of a Controlled Substance—Heroin—Hawksworth Apartments—January 23, 2012

2.  Whether the court below erred in allowing witnesses to present improper hearsay testimony, in particular: Jessica

Bales; Trooper Gregg Norton; Kelsey Graham; and Desiree Wilson.

3. Whether the court below erred in allowing the Commonwealth to offer prior bad act testimony from Desiree Wilson and Jimmie Lee Knight in violation of Pennsylvania Rule of Evidence 404.

4. Whether the court below erred in allowing evidence to be presented in violation of the best evidence rule from Tpr. Daniel Wojcik.

5. Whether the sentence imposed is excessive, failing to comport with the goal and objectives of the sentencing code, having not given sufficient weight to the personal history factors, the time frame in which the incidents occurred, as well as the factors raised by counsel at the time of sentencing.

6. Whether the court below erred in imposing mandatory minimum sentences at Counts 17 (5 to 10 years) and 19 (3 to 6 years) without submitting the weight of the drugs to the jury in violation of *Alleyne v. United States*, 133 S.Ct. 2151 (2013).

Appellant's brief at 5-6.

In conducting a sufficiency of the evidence review, we view all of the evidence admitted, even improperly admitted evidence. *Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa.Super. 2013) (*en banc*). We consider such evidence in a light most favorable to the Commonwealth as the verdict winner, drawing all reasonable inferences from the evidence in favor of the Commonwealth. *Id*. When evidence exists to allow the fact-finder to determine beyond a reasonable doubt each element of the crimes charged, the sufficiency claim will fail. *Id*.

The evidence "need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Id*. In addition, the Commonwealth can prove its case by circumstantial evidence. Where "the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances[,]" a defendant is entitled to relief. This Court is not permitted "to re-weigh the evidence and substitute our judgment for that of the fact-finder." *Id*.

Appellant's specific challenge relates to the jury's adjudication on three separate delivery of heroin charges. Two of those crimes pertain to specific incidents and another count, count four, was a historical charge relative to other heroin transactions between January 2011 and April 19, 2012, not encompassed by the specific charges.

Initially, we note that Appellant begins his argument by setting forth a weight of the evidence claim and not a sufficiency argument. The two types of issues are distinct. Indeed, a weight claim concedes that sufficient evidence exists. *Commonwealth v. Lewis*, 911 A.2d 558, 566 (Pa.Super. 2006). Muddling the two categories, Appellant proceeds to maintain that the "historical count was based on speculation and lacked sufficient evidence at trial to support a finding of guilty." Appellant's brief at 13-14. According to Appellant, the charge was vague and could have permitted the jury to find

him guilty based on one of the specific incidents. Additionally, he posits that there was no lab report as to the historical charge.[4]

The Commonwealth counters that the historical count was "proven, not by speculation, but by the direct testimony of multiple admitted heroin addicts." Commonwealth's brief at 21. It highlights that Kelsey Graham testified to purchasing heroin from Appellant the first time she met him. She also submitted that Appellant provided her with heroin in exchange for sex. Ms. Graham further maintained that Appellant supplied her with ten bags of heroin after she transported him to Paterson, New Jersey, so that he could purchase heroin for resale in Greensburg.

Sarah Householder indicated that she had purchased heroin from Appellant, and Laura Beth Stinson testified that Appellant provided her with heroin once or twice. Jillian Davis acknowledged receiving heroin from Appellant, and Jimmie Knight testified that the first time he met Appellant he purchased heroin from him. All of the aforementioned witnesses testified that these purchases occurred between the summer of 2011 and spring of 2012. This overwhelming amount of evidence unequivocally is sufficient to demonstrate that Appellant delivered heroin at times not specified in the remaining delivery and PWID counts. Appellant's argument relative to the historical count is meritless.

_____

[4] The reason for the lack of a lab report was, of course, because the individuals who testified about the purchases had used the drug.

Appellant also contests a December 7, 2011 cocaine delivery and a January 23, 2012 delivery of heroin. The December incident occurred when Appellant and Anna Morcheid met with Chauncy Bray, one day after Mr. Bray's release from prison, at a Red Robin restaurant. During the meeting, Ms. Morcheid exited the restaurant and delivered cocaine to a confidential informant.

Appellant maintains that he was merely present at the restaurant with Ms. Morcheid when she delivered cocaine and not involved with the cocaine transaction. The Commonwealth responds that Appellant was liable as an accomplice and a co-conspirator. It points out that the purpose of the meeting at Red Robin was to discuss the drug trade. The Commonwealth highlights that while Mr. Bray was incarcerated, Appellant retained Mr. Bray's cellphone with heroin contacts and Ms. Morcheid had Mr. Bray's "crack phone." Hence, it suggests that Mr. Bray, Appellant, and Ms. Morcheid continued drug operations while Mr. Bray was incarcerated. Finally, the Commonwealth avers that the jury was instructed that it could not find Appellant guilty based on his mere presence at Red Robin and is presumed to have followed that instruction.

The trial court concluded that, because Appellant was charged at count three of the criminal information with conspiracy to deliver and possession with intent to deliver a controlled substance and Ms. Morcheid and Mr. Bray were specifically named in that count as co-conspirators, Appellant was

liable for their acts in furtherance of the conspiracy. Here, the jury was charged on both conspiratorial and accomplice liability.[5] Appellant did not challenge either instruction. As recently highlighted, the two concepts are distinct. **Commonwealth v. Knox**, ___ A.3d ___ (Pa. 2014) (filed December 15, 2014); **see also commonwealth v. Roebuck**, 32 A.3d 613, 622-623 (Pa. 2011). Accomplice liability is offense specific. **Knox**, **supra**. A person is only an accomplice if, acting with intent to facilitate, in this case, a cocaine delivery, he solicits, aids, agrees or attempts to aid the person in planning or committing the crime. 18 Pa.C.S. § 306.

A person's "status as an accomplice relative to some crimes within a larger criminal undertaking or episode no longer *per se* renders a defendant liable as an accomplice for all other crimes committed." **Knox**, **supra** at *2. Thus, as it relates to accomplice liability, we look to whether the evidence demonstrated that Appellant promoted or facilitated Ms. Morcheid's delivery of cocaine by aiding, agreeing to aid, or attempting to aid her in delivering that substance.

_____

[5] Justice Eakin in a concurring opinion in **Commonwealth v. Knox**, ___ A.3d ___ (Pa. 2014), disputed that a person can be found guilty of an underlying possession of a firearm crime as a conspirator. Rather, he opined that the person is guilty of a conspiracy, which is itself a separate crime, or guilty of the firearms crime under accomplice liability or joint/constructive possession. **Compare Commonwealth v. Johnson**, 26 A.3d 1078, 1096 (Pa. 2011) (Eakin, J., concurring) ("heroin found in a co-conspirator's possession may be attributable to the defendant as a result of conspiratorial liability.").

With respect to conspiratorial liability, it must be remembered that conspiracy to commit a substantive offense and the substantive offense itself are separate crimes. *Commonwealth v. Johnson*, 26 A.3d 1078, 1090 (Pa. 2011). A conspirator is responsible "for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy." *Commonwealth v. Roux*, 350 A.2d 867, 871 (Pa. 1976). Hence, illegal narcotics possessed and delivered by one member of a conspiracy may be attributed to another member of that conspiracy.

The trial court instructed the jury that it could find Appellant guilty under conspiratorial liability

> for the act or acts of another person or persons if each of the following elements [was] proved beyond a reasonable doubt:
>
> (a)    that the other person who committed a specific act was also a member of the same conspiracy;
>
> (b)    that the crime in question was committed while the conspiracy was in existence; and
>
> (c)    that the crime in question was committed to further the goals of the conspiracy.

N.T., 6/17-24/14, at 1263.

This Court has further held that a person is a conspirator if they "1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Devine*, 26

- 15 -

A.3d 1139, 1147 (Pa.Super. 2011) (discussing concept of conspiracy in the context of the substantive crime of conspiracy). In examining whether a conspiracy exists, we consider any association between the alleged conspirators; knowledge of the commission of the crime; presence at the scene of the crime, and participation in the object of the conspiracy." ***Commonwealth v. Lambert***, 795 A.2d 1010, 1016 (Pa.Super. 2002) (*en banc*) (analyzing substantive crime of conspiracy).

Instantly, the evidence of record demonstrates that Mr. Bray had previously supplied Appellant with a phone for dealing heroin. Mr. Bray's "crack phone" was possessed by Ms. Morcheid. Ms. Morcheid also was involved in dealing heroin for Appellant, and was later arrested in possession of a significant quantity of heroin. She met with Mr. Bray and Appellant on the date in question to facilitate the ongoing drug business. During this meeting at the Red Robin, Ms. Morcheid delivered crack cocaine to a CI in the presence of an undercover police officer.

This evidence substantiates that Appellant was actively engaged in an ongoing conspiracy with Mr. Bray and Ms. Morcheid to sell illegal drugs. Although Appellant was more involved in the sale of heroin, he was not merely present at the Red Robin when Ms. Morcheid delivered the cocaine. Mr. Bray had just been released from prison. Appellant and Ms. Morcheid were continuing to operate Mr. Bray's drug enterprise during his incarceration. Ms. Morcheid was actively involved with aiding Appellant in

the sale of heroin as well. The evidence was not so weak and inconclusive that no probability of fact could be derived therefrom. The jury could have reasonably inferred that Ms. Morcheid was assisting Appellant in selling cocaine. Accordingly, we decline to upset the jury's verdict and find sufficient evidence was introduced to establish Appellant's guilt.

Appellant's final sufficiency argument is that Trooper Norton could not identify Appellant as being present on January 23, 2012, when CI Jimmie Knight purchased heroin. He submits that Mr. Knight could not recall with clarity the January 23rd incident and admitted to making other purchases at the Hawksworth Garden apartments that were consistent with the January 23rd transaction. Without citation to any legal authority, Appellant argues that the conviction based on the January 23rd event is founded on speculation.

The Commonwealth rejoins that Mr. Knight identified Appellant as the person who sold him heroin at least twice in the stairwell of the Hawksworth Garden apartments. It acknowledges that Mr. Knight admitted to purchasing heroin after controlled buys for his own use. Nonetheless, it notes that Trooper Norton did identify Appellant from the January 19th incident and Mr. Knight telephoned the same 724-217-6662 number on both occasions.

Here, Appellant's claim fails. The telephone number used on January 23, 2012 to set up the purchase was the same number of a phone found on Appellant when he was arrested. Appellant, on January 19, 2012,

had been personally observed at the same location with Mr. Knight after Mr. Knight called the number in question to purchase heroin. The evidence shows that Appellant was the principal supplier of heroin for the other low level drug sellers. Even if Appellant was not actually present, evidence that he conspired with those regularly selling heroin from the Hawksworth Garden Apartments was overwhelming. This is simply not a case where the evidence is so weak and inconclusive that no probability of fact can be drawn from it.

The second issue Appellant forwards is that the court erred by permitting four separate witnesses to offer hearsay testimony. We consider a trial court's decision on the admission of evidence under an abuse of discretion standard. *Commonwealth v. Feliciano*, 67 A.3d 19, 27 (Pa.Super. 2013) (*en banc*). Appellant first maintains that certain testimony by Jessica Bales was improperly admitted. He submits that Ms. Bales' testimony that Chauncy Bray instructed her to pick up several bricks of heroin from one person's home and transport them to another house was hearsay. Appellant continues that the co-conspirator exception to the hearsay rule did not apply. In this regard, Appellant asserts that the statement evidenced a conspiracy between Mr. Bray and Ms. Bales, but had no relation to him.

The Commonwealth rejoins that Ms. Bales' testimony was admissible under the co-conspirator exception to the hearsay rule. *See* Pa.R.E.

803(25). "[T]o establish the admissibility of a coconspirator's statement, it is not required to prove beyond a reasonable doubt that a conspiracy existed. Rather, it must only show by a preponderance of the evidence that a conspiracy existed." *Feliciano*, *supra* at 26-27. The preponderance standard "may be inferentially established by showing the relation, conduct or circumstances of the parties." *Id*. at 27.

The Commonwealth points out that, prior to the disputed testimony, Ms. Bales testified that beginning in the summer of 2011 she had discussed selling heroin with Appellant. She also provided that Appellant stored heroin in the ceiling tiles of her home and brought other individuals to her residence to sell heroin. The Commonwealth adds that Ms. Bales testified that she knew Appellant, Mr. Bray, and Dominick Haynes were involved with selling heroin together. According to the Commonwealth, this evidence establishes by a preponderance of the evidence that a conspiracy existed between all of these individuals to sell illegal drugs. We agree.

Appellant's paltry argument ignores that the co-conspirator exception applies to statements made by a party's co-conspirator during and in furtherance of the conspiracy. Mr. Bray was part of the conspiracy with Appellant and his statements to Ms. Bales certainly were made in furtherance of the conspiracy. *See Feliciano*, *supra* at 27 ("To lay a foundation for the co-conspirator exception to the hearsay rule, the Commonwealth must prove that: (1) a conspiracy existed between declarant

and the person against whom the evidence is offered and (2) the statement sought to be admitted was made during the course of the conspiracy. In addition, there must be evidence other than the statement of the co-conspirator to prove that a conspiracy existed."). Appellant's position is without merit.

Next, Appellant contends that the trial court erred in permitting Trooper Norton to testify to information provided to him by a CI, Jimmie Knight. In one paragraph, and without citation to legal authority, Appellant argues that Trooper Norton's testimony that Mr. Knight identified a person nicknamed "Jae or Jizzle" as the drug seller was inadmissible hearsay where other evidence showed that these were Appellant's nicknames.

The Commonwealth counters that the evidence was not hearsay and, even if it was hearsay, it fell within the then-existing mental, emotional, or physical condition exception. We need not delve too deeply into these arguments because, even assuming *arguendo* that the statements were inadmissible hearsay, the identical evidence was properly admitted via Mr. Knight's own testimony. Thus, the evidence was merely cumulative of other properly admitted evidence and could not have had any effect on the outcome of the trial.

Appellant also challenges testimony from Kelsey Graham. Specifically, Appellant posits that Ms. Graham's testimony that Kristen Weightman had told her that Appellant was upset at Ms. Weightman for messing up money

connected to heroin transactions was hearsay. He avers that this testimony does not fall within the co-conspirator exception to the hearsay rule because it impermissibly bootstraps. In this respect, he argues that the statement itself is what establishes the conspiracy.

The Commonwealth responds that the evidence was admissible under the co-conspirator exception since it established Ms. Weightman's role in the drug organization through various other sources. It notes that Ms. Weightman was romantically involved with Appellant for a period, and that numerous individuals testified that Ms. Weightman sold heroin for Appellant.

The evidence that Ms. Weightman was involved in the drug conspiracy is overwhelming. The objected-to statement was not the only evidence that established a conspiracy between Appellant and Ms. Weightman. Therefore, Appellant's argument misses the mark. Moreover, the statement was not introduced to prove that Ms. Weightman did, in fact, botch various heroin deals. Hence, the evidence does not qualify as hearsay because it was not introduced for the truth of the matter asserted. **See** Pa.R.E. 802. It is not impermissible bootstrapping to allow the evidence as proof of the conspiracy when the statement is not being used to prove the truth of the underlying statement. Appellant's position with respect to Desiree Wilson is identical to that leveled as to Ms. Weightman; and, therefore, it fails for the same reasons.

Appellant's third argument on appeal is that the trial court erred in allowing the introduction of prior bad acts evidence. Appellant challenges the introduction of two pieces of evidence. First, he asserts that it was error to allow Desiree Wilson to testify that she heard Appellant slap Ms. Weightman, presumably over Ms. Weightman's inability to manage the money aspect of the heroin dealing and her usage of the product. Second, Appellant contends that the court erred in permitting Mr. Knight to testify that Appellant offered him $5,000 not to testify at trial.

As to the testimony of both Ms. Wilson and Mr. Knight, Appellant failed to object. Appellant earlier objected to Ms. Wilson's testimony regarding Ms. Weightman accepting $250 in counterfeit money for heroin, but did not object to her testimony that Appellant smacked Ms. Weightman. Thus, the issue is not preserved. Pa.R.A.P. 302(a). With regard to Mr. Knight's pertinent testimony, Appellant objected once to the leading nature of one question, which the trial court sustained. He did not contest the introduction of evidence that he offered Mr. Knight $5,000 not to testify. Accordingly, his issue is waived. Further, even if the issue was not waived, we would find no error in its admission since Mr. Knight's testimony was admissible to establish consciousness of guilt. *See Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007) (collecting cases).

The fourth claim Appellant levels on appeal is that the court erred in disregarding the best evidence rule by permitting New Jersey State Trooper

Daniel Wojcik to testify to the traffic stop he performed on Kelsey Graham and Appellant in New Jersey. Prior to testifying, the officer reviewed a video tape of the traffic stop. Appellant objected at trial and argued that the video was the best evidence of what occurred and it was improper to ask the witness about what he viewed on the tape. The Commonwealth responded that the witness had already described what he saw and was only asking whether his viewing of the tape before trial allowed him to refresh his recollection of the traffic stop.

The best evidence rule provides, "To prove the content of a writing, recording, or photograph, the original writing, recording or photograph is required, except as otherwise provides in these rules, by other rules prescribed by the Supreme Court, or by statute." Pa.R.E. 1002. Appellant relies on **Commonwealth v. Lewis**, 623 A.2d 355 (Pa.Super. 1993), in support. **Lewis** involved a retail theft trial. Therein, security footage captured the defendant and another individual shoplifting inside Sears electronic department. A store security guard apprehended the men and contacted local police. At trial, the police officer who responded testified with respect to what he viewed on the surveillance tape. In contrast to this matter, the officer did not personally observe the acts. We ruled that the failure to introduce the tape violated the best evidence rule.

This case is easily distinguishable since the officer personally took part in the traffic stop and viewed the incident himself. The best evidence rule

was not implicated.  ***Compare Lewis***, ***supra*** at 359 ("Officer Barclay had viewed the tape; nevertheless, he did not have first-hand knowledge of Appellant's alleged act of theft; rather, whatever knowledge he possessed was gained from his viewing of the videotape. Thus, the original tape should have been produced."); ***see also*** Pa.R.E. 614 ("A witness may use a writing or other item to refresh memory for the purpose of testifying while testify, or before testifying.").

Appellant's penultimate issue relates to the discretionary aspects of his sentence. To adequately preserve a discretionary sentencing claim, the defendant must present the issue in either a post-sentence motion, or raise the claim during the sentencing proceedings.  ***Commonwealth v. Cartrette***, 83 A.3d 1030, 1042 (Pa.Super. 2013) (*en banc*). Further, the defendant must "preserve the issue in a court-ordered Pa.R.A.P. 1925(b) concise statement and a Pa.R.A.P. 2119(f) statement."  ***Id***.  Importantly, "[t]here is no absolute right to appeal when challenging the discretionary aspect of a sentence."  ***Id***.  "[A]n appeal is permitted only after this Court determines that there is a substantial question that the sentence was not appropriate under the sentencing code." ***Id.***

Appellant preserved his issue in his motion to modify his sentence and his Pa.R.A.P. 1925(b) statement.  However, he has failed to include a Pa.R.A.P. 2119(f) statement in his brief.  Nonetheless, the Commonwealth has not objected to the absence of a Pa.R.A.P. 2119(f) statement.

Accordingly, we do not find waiver on that basis. *See Commonwealth v. Stewart*, 867 A.2d 589 (Pa.Super. 2005).

Appellant acknowledges that the sentences at each count were within the sentencing guidelines. Nevertheless, he maintains that the court failed to give sufficient weight to his difficult upbringing and the short period in which the drug enterprise operated. Thus, he maintains that his twenty-to-forty year sentence was excessive.

This Court has previously commented on the disparity in our jurisprudence governing determining substantial questions. *See Commonwealth v. Dodge*, 77 A.3d 1263, 1272 n.8 (Pa.Super. 2013). There, we also discussed that a bald excessiveness claim does not present a substantial question, but an excessiveness challenge is not *per se* precluded from raising a substantial question for review. We noted that claims pertaining to the sentencing court's failure to consider or inadequately considering facts of record had been held in some cases as not presenting a substantial question. *Id*. Yet, in a number of other cases, this Court has found that an allegation that a sentencing court's sentence was excessive because it did not consider mitigating factors presented a substantial question. *Id*. (citing *Commonwealth v. Perry*, 883 A.2d 599, 602 (Pa.Super. 2005)). In light of these apparent inconsistencies, we decline to find that Appellant has not presented a substantial question.

When considering a discretionary aspects of sentencing claim, we analyze the sentencing court's decision under an abuse of discretion standard. ***Dodge***, ***supra*** at 1274. In conducting this review, we are guided by the statutory requirements of 42 Pa.C.S. § 9781(c) and (d). ***Id***. Section 9781(c) provides that this Court shall vacate a sentence and remand under three circumstances. Relevant hereto is if the sentence is within the sentencing guidelines, "but the case involves circumstances where the application of the guidelines would be clearly unreasonable[.]" 42 Pa.C.S. § 9781(c)(2). In addition, we consider:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.
>
> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
>
> (3) The findings upon which the sentence was based.
>
> (4) The guidelines promulgated by the commission.

42 Pa.C.S. § 9781(d).

In the present case, the sentencing court imposed concurrent sentences on seven counts and consecutive sentences on an additional nine counts. These sentences were within the standard range of the sentencing guidelines. It considered that Appellant headed a large-scale drug operation and that heroin addiction had devastated the community. The court noted that Appellant had previously been on probation but continued to pursue criminal activity. It acknowledged Appellant's troubled family life and past

drug history. The court highlighted that Appellant knew the serious effects of heroin addiction insofar as he did not use the drug, but still sold it, and took advantage of vulnerable individuals. It also found that he exhibited no remorse. Finally, the court considered a presentence investigation report.

It is evident from the record that the sentencing court considered the appropriate guidelines and mitigating and aggravating facts in constructing its sentence. The reasons given for Appellant's sentence are sound. The sentence imposed is not clearly unreasonable; therefore, the court did not abuse its discretion.

Lastly, Appellant contends that his sentence is unconstitutional under **Alleyne v. United States**, 133 S.Ct. 2151 (2013). **Alleyne** held that facts that increase a defendant's mandatory minimum sentence are elements of the crime and must be proven beyond a reasonable doubt or a defendant's jury trial right is violated. Accordingly, many mandatory minimum sentencing statutes in Pennsylvania are no longer constitutionally sound. **See Commonwealth v. Watley**, 81 A.3d 108 (Pa.Super. 2013) (*en banc*). More recently, this Court has held that the statute governing drug mandatories, at issue here, is unconstitutional as a whole and that a sentence under such a provision is illegal.[6] **Commonwealth v. Cardwell**,

_____

[6] Writing solely for myself herein, I note that I have disagreed with the rationale expressing that our mandatory minimum sentencing statutes are not severable. **See Commonwealth v. Bizzel**, 2014 PA Super 267 (Bowes,

*(Footnote Continued Next Page)*

2014 PA Super 263; *see also Commonwealth v. Thompson*, 93 A.3d 478

(Pa.Super. 2014) (defendant entitled to resentencing pursuant to *Alleyne*

where the weight of the drugs was not determined by a jury beyond a

reasonable doubt).  Accordingly, Appellant is entitled to sentencing relief.

Judgment of sentence vacated.  Case remanded for resentencing.

Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/9/2015

J., concurring).  I continue to adhere to that view.  Nonetheless, even absent the severability decisions relative to the mandatory sentencing statutes, Appellant's sentence does not fall within the *Alleyne* harmless error analysis posited by myself in *Bizzel* or the majority in *Commonwealth v. Watley*, 81 A.3d 108 (Pa.Super. 2013) (*en banc*).  Phrased differently, the jury verdict in this case does not make it clear that it determined that Appellant possessed the requisite weight of heroin beyond a reasonable doubt.  *See Commonwealth v. Thompson*, 93 A.3d 478 (Pa.Super. 2014).